1   JAMES C. YOON, State Bar No. 177155
    (jyoon@wsgr.com)
2   CATHERINE R. LACEY, State Bar No. 291591
    (clacey@wsgr.com)
3   JAMIE Y. OTTO, State Bar No. 295099
    (jotto@wsgr.com)
4   WILSON SONSINI GOODRICH & ROSATI, P.C.
    650 Page Mill Rd
5   Palo Alto, CA 94304-1050
    Tel: 650-493-9300
6   Fax: 650-565-5100

7   LUCY YEN, State Bar No. 224559
    (lyen@wsgr.com)
8   CASSIE L. BLACK (*pro hac vice* forthcoming)
    (cblack@wsgr.com)
9   WILSON SONSINI GOODRICH & ROSATI, P.C.
    1301 Avenue of the Americas
10  40th Floor
    New York, NY 10019
11  Tel: 212-999-5800
    Fax: 866-974-7329

12

13  *Attorneys for Defendant Visa Inc.*

14

15              UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17

18  CORTEX MCP, INC.,                          CASE NO.: 5:23-CV-05720

19                  Plaintiff,                 **DEFENDANT VISA INC.'S NOTICE
                                               OF MOTION AND MOTION TO
20          v.                                 DISMISS UNDER FED. R. CIV. P.
                                               12(B)(6) FOR UNPATENTABILITY
21  VISA INC.,                                 UNDER SECTION 101 AND TO
                                               DISMISS WILLFUL AND INDIRECT
22                  Defendant.                 INFRINGEMENT CLAIMS**

23                                             **[FILED CONCURRENTLY WITH
                                               DECLARATION OF CATHERINE R.
24                                             LACEY]**

25                                             Hearing Date:  February 29, 2024
                                               Hearing Time:  9:00 a.m.
26                                             Courtroom:  4, 5th Floor
                                               Judge:  Hon. Edward J. Davila

27

28

1

**NOTICE OF MOTION AND MOTION**

2
PLEASE TAKE NOTICE that, on February 29, 2024 at 9:00 a.m., or as soon thereafter as

3
the matter can be heard, in the courtroom of the Honorable Edward J. Davila of the United States

4
District Court for the Northern District of California, San Jose Courthouse, 280 South 1st Street, San

5
Jose, CA 95113, Courtroom 4—5th Floor, Defendant Visa Inc. ("Visa") will present its Motion to

6
Dismiss under Federal Rule of Civil Procedure 12(b)(6) for Unpatentability under Section 101 and

7
to Dismiss Willful and Indirect Infringement Claims.

8
Visa respectfully moves the Court to dismiss the First Amended Complaint (Dkt. 25; "FAC")

9
of Plaintiff Cortex MCP, Inc. ("Cortex") with prejudice.  As explained in Visa's accompanying

10
Memorandum of Points and Authorities, the patents asserted in Cortex's FAC are invalid under 35

11
U.S.C. § 101 for claiming ineligible subject matter.  In the alternative, Visa respectfully moves the

12
Court to dismiss Cortex's claims for willful, induced, and contributory infringement as Cortex has

13
failed to plausibly plead pre-suit knowledge of any of the asserted patents or infringement thereof

14
as well as other necessary elements of these claims.  Visa's Motion is supported by this Notice and

15
Memorandum, the accompanying supporting declaration of Catherine R. Lacey and the exhibits

16
attached thereto, and any oral argument the Court may deem appropriate.

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated: December 7, 2023           By: _/s/ Lucy Yen_____

2

3                                   James C. Yoon, State Bar No. 177155
                                  (jyoon@wsgr.com)

4                                   Catherine R. Lacey, State Bar No. 291591
                                  (clacey@wsgr.com)
Jamie Y. Otto, State Bar No. 295099

5                                   (jotto@wsgr.com)
WILSON SONSINI GOODRICH & ROSATI, P.C.

6                                   650 Page Mill Rd
Palo Alto, CA 94304-1050

7                                   Tel:  650-493-9300
Fax: 650-565-5100

8                                   Lucy Yen, State Bar No. 224559
(lyen@wsgr.com)

9                                   Cassie L. Black (*pro hac vice* forthcoming)
                                  (cblack@wsgr.com)

10                                 WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor

11                                 New York, NY 10019
Tel:  212-999-5800

12                                 Fax:  866-974-7329

13                                 *Attorneys for Defendant Visa Inc.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................................1

I.   INTRODUCTION .............................................................................................................1

II.  BACKGROUND ...............................................................................................................2

   A.   The Asserted Patents ............................................................................................2

   B.   Alleged Communications Between Cortex and CyberSource or Visa...................5

III. LEGAL STANDARD .......................................................................................................7

   A.   Dismissal Under Federal Rule of Civil Procedure 12(b)(6)..................................7

   B.   Unpatentable Subject Matter under 35 U.S.C. § 101 ...........................................7

   C.   Knowledge of Asserted Patents.............................................................................7

IV.  ARGUMENT .....................................................................................................................8

   A.   The Asserted Patents Are Invalid Under Section 101 ...........................................8

        1.   Claim 1 of the '531 Patent, Claim 15 of the '854 Patent, Claim 1 of
             the '859 Patent, and Claim 1 of the '973 Patent Are Representative
             for Purposes of Section 101 .......................................................................8

        2.   *Alice* Step 1:  The Representative Claims Are Directed to Abstract
             Ideas ...........................................................................................................9

        3.   *Alice* Step 2:  The Representative Claims Do Not Recite An
             Inventive Concept .....................................................................................13

   B.   Alternatively, Cortex's Claims for Willful and Indirect Infringement Should
        Be Dismissed........................................................................................................14

        1.   Cortex Fails to Plead Pre-Suit Knowledge of Any of the Asserted
             Patents or Infringement Thereof...............................................................14

        2.   Cortex Fails to Plead Egregious Misconduct as Required for Willful
             Infringement ..............................................................................................18

        3.   Cortex Fails to Plead Specific Intent to Induce Infringement...................19

        4.   Cortex Fails to Plead the Absence of Substantial Non-Infringing
             Uses As Required for Contributory Infringement......................................22

V.   CONCLUSION ................................................................................................................23

1

## TABLE OF AUTHORITIES

2

**PAGE(S)**

3

### CASES

4

*Addiction & Detoxification Inst. L.L.C. v. Carpenter*,
620 F. App'x 934 (Fed. Cir. 2015)..................................................................... 19

5

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016)........................................................................ 9

6

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ..................................................................................*passim*

7

8

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016)........................................................................ 9

9

*Artrip v. Ball Corp.*,
735 F. App'x 708 (Fed. Cir. 2018)................................................................... 22

10

11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................... 7, 16

12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 7

13

14

*Bench Walk Lighting LLC v. LG Innotek Co.*,
530 F. Supp. 3d 468 (D. Del. 2021) ................................................................ 17

15

*Blackberry Ltd. v. Nokia Corp.*,
No. 17-cv-155-RGA, 2018 WL 1401330 (D. Del. Mar. 20, 2018).................. 23

16

17

*Bos. Sci. Corp. v. Nevro Corp.*,
560 F. Supp. 3d 837 (D. Del. 2021) ................................................................ 18

18

*CyWee Grp. Ltd. v. HTC Corp.*,
312 F. Supp. 3d 974 (W.D. Wash. 2018) ........................................................ 20

19

20

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)....................................................................... 14

21

*Dental Monitoring SAS v. Align Tech., Inc.*,
No. 22-7335-WHA, 2023 WL 4297570 (N.D. Cal. June 30, 2023) ............ 7, 15

22

23

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)...................................................................... 8, 9

24

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)....................................................................... 12

25

26

*Fluidigm Corp. v. IONpath, Inc.*,
No. 19-cv-5639-WHA, 2020 WL 408988 (N.D. Cal. Jan. 24, 2020) ........ 17, 20

27

28

*Fortinet Inc. v. FireEye Inc.*,
   No. 5:13-cv-2496-EJD, 2014 WL 4955087 (N.D. Cal. Sept. 30, 2014) ................ 8, 15, 19

*GoTV Streaming, LLC v. Netflix, Inc.*,
   No. 2:22-cv-7556-RGK-SHK, 2023 WL 2627016 (C.D. Cal. Feb. 16, 2023) ................. 8

*I/P Engine, Inc. v. AOL Inc.*,
   576 F. App'x 982 (Fed. Cir. 2014) ........................................................................ 7

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*,
   681 F.3d 1323 (Fed. Cir. 2012) ........................................................................ 23

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
   850 F.3d 1332 (Fed. Cir. 2017) ........................................................................ 14

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
   876 F.3d 1372 (Fed. Cir. 2017) .................................................................. 1, 13

*MasterObjects, Inc. v. Amazon.com, Inc.*,
   No. 20-cv-8103-WHA, 2021 WL 4685306 (N.D. Cal. Oct. 7, 2021) .......................... 16

*Memory Integrity, LLC v. Intel Corp.*,
   144 F. Supp. 3d 1185 (D. Or. 2015) .............................................................. 20, 21

*Mich. Motor Techs. LLC v. Volkswagen Aktiengesellschaft*,
   472 F. Supp. 3d 377 (E.D. Mich. 2020) ........................................................ 16, 17

*PersonalWeb Techs. LLC v. Google LLC*,
   8 F.4th 1310 (Fed. Cir. 2021) ........................................................................ 13

*Plexxikon Inc. v. Novartis Pharms. Corp.*,
   631 F. Supp. 3d 823 (N.D. Cal. 2022) .............................................................. 18

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
   696 F. App'x 1014 (Fed. Cir. 2017) .............................................................. 11

*Samsung Elecs. Co. v. Blaze Mobile, Inc.*,
   No. 21-cv-2989-EJD, 2023 WL 3510380 (N.D. Cal. May 16, 2023) .......................... 10

*Sanderling Mgmt. v. Snap Inc.*,
   65 F.4th 698 (Fed. Cir. 2023) ........................................................................ 8

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ........................................................................ 7

*Secured Mail Sols., LLC v. Universal Wilde, Inc.*,
   873 F.3d 905 (Fed. Cir. 2017) ........................................................................ 11

*Sepehry-Fard v. Aurora Bank FSB*,
   No. 5:12-cv-871-EJD, 2012 WL 3583249 (N.D. Cal. Aug. 20, 2012), *aff'd*,
   588 F. App'x 683 (9th Cir. 2014) .................................................................... 21

*SiOnyx, LLC v. Hamamatsu Photonics K.K.*,
   330 F. Supp. 3d 574 (D. Mass. 2018) .............................................................. 16

*Slot Speaker Techs., Inc. v. Apple, Inc.*,
    No. 13-cv-161-HSG, 2017 WL 4354999 (N.D. Cal. Sept. 29, 2017) ............................. 18

*Smart Authentication IP, LLC v. Electronic Arts, Inc.*,
    402 F. Supp. 3d 842 (N.D. Cal. 2019) ................................................................. 11, 12, 14

*Sonos, Inc. v. Google LLC*,
    591 F. Supp. 3d 638 (N.D. Cal. 2022) ................................................................. 8, 18, 22

*Splunk Inc. v. Cribl, Inc.*,
    No. 22-cv-07611-WHA, 2023 WL 2562875 (N.D. Cal. Mar. 17, 2023) ................... 14, 15

*Takeda Pharms. v. West-Ward Pharm.*,
    785 F.3d 625 (Fed. Cir. 2015) ............................................................................................ 20

*Traxcell Techs., LLC v. Verizon Wireless Pers. Commc'ns, LP*,
    No. 6:20-cv-1175-ADA, 2022 WL 299732 (W.D. Tex. Jan. 31, 2022) ......................... 23

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) ......................................................................................... 14

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ........................................................................................... 11

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*,
    916 F.3d 1363 (Fed. Cir. 2019) ......................................................................................... 13

*Universal Secure Registry LLC v. Apple Inc.*,
    10 F.4th 1342 (Fed. Cir. 2021) .......................................................................................... 11

*Wildseed Mobile LLC v. Google LLC*,
    No. 22-cv-4928-WHO, 2023 WL 3898979 (N.D. Cal. June 7, 2023) ........................... 8, 9

*WiNet Labs LLC v. Apple Inc.*,
    No. 5:19-cv-2248-EJD, 2020 WL 409012 (N.D. Cal. Jan. 24, 2020)................... 2, 7, 18, 19

*ZapFraud, Inc. v. Barracuda Networks, Inc.*,
    528 F. Supp. 3d 247 (D. Del. 2021) ..................................................................................... 8

**STATUTES**

35 U.S.C. § 101 .........................................................................................................*passim*

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.     INTRODUCTION**

3     All claims of U.S. Patent Nos. 9,251,531 ("'531 Patent"); 9,954,854 ("'854 Patent");

4     10,749,859 ("'859 Patent"); and 11,329,973 ("'973 Patent") (collectively, the "Asserted Patents")

5     are directed to patent-ineligible abstract ideas, fail to incorporate any inventive concepts sufficient

6     to transform what is claimed into a patent-eligible application, and are therefore invalid under 35

7     U.S.C. § 101.  Cortex thus cannot state a claim upon which relief can be granted under Federal Rule

8     of Civil Procedure 12(b)(6), and its First Amended Complaint should be dismissed with prejudice.

9     (Dkt. 25 or "FAC").

10     According to Cortex's own characterization, its Asserted Patents "***cover[] every aspect*** of

11     provisioning a representative credential that can be scanned and verified."  FAC ¶ 11 (emphasis

12     added).[1]   Provisioning, scanning, and verifying a representative credential is not a technical

13     advancement or even a computer-specific concept—humans have provided, scanned, and verified

14     credentials for at least a century.[2]  The language of the claims themselves confirms that they are

15     directed to nothing more than the abstract idea of issuing and checking credentials.  This is the "type

16     of fundamental business practice that, when implemented using generic computer technology," as

17     in Cortex's claims, "is not patent-eligible under *Alice*."  *Inventor Holdings, LLC v. Bed Bath &*

18     *Beyond, Inc.*, 876 F.3d 1372, 1378 (Fed. Cir. 2017) (citing *Alice Corp. Pty. v. CLS Bank Int'l*, 573

19     U.S. 208, 217 (2014)).  No one, including Cortex, "is entitled to 'wholly preempt'" basic concepts

20     such as issuing and checking credentials.  *See id.*  The claims of the Asserted Patents are invalid as

21     unpatentable under Section 101.

22

23     _____

[1] All emphases herein are added, and all internal citations and quotations are omitted unless

24     otherwise noted.

25     [2] *See, e.g.*, Ex. 1, available at

26     https://archive.nytimes.com/www.nytimes.com/interactive/2013/03/17/nyregion/17licenses-

27     evolution.html (showing New York chauffer's license cards issued in 1910).

28

Independently and alternatively, Cortex's claims for willful and indirect infringement of the Asserted Patents should be dismissed with prejudice. *First*, both willful and indirect infringement require knowledge of the patent and the alleged infringement, and Cortex has failed to plausibly allege that Visa had pre-suit knowledge of any of the Asserted Patents, even after amending its allegations. The only alleged pre-suit communications occurred before three of the four Asserted Patents had even ***issued***, and the alleged communications did not plausibly identify to Visa the remaining patent or any alleged infringement thereof.

*Second*, each of willful, induced, and contributory infringement requires more than mere knowledge of the patent and its infringement, and Cortex has failed to plausibly plead facts to meet these additional requirements. For example, willful infringement requires "egregious" behavior "beyond typical infringement," and Cortex's "conclusory allegations that [Visa] knew of [its] patent, but infringed it anyway" are insufficient. *WiNet Labs LLC v. Apple Inc.*, No. 5:19-cv-2248-EJD, 2020 WL 409012, at *5 (N.D. Cal. Jan. 24, 2020). Similarly, induced infringement requires allegations that Visa specifically intended to cause a third party to ***infringe*** the Asserted Patents, and Cortex's descriptions of Visa's websites and EMVCo specifications fall far short of meeting the required standard. Cortex's allegations on contributory infringement are even more generic, amount to nothing more than a recitation of legal elements, and contravene Federal Circuit precedent.

Thus, even if the Court declines at this stage to dismiss all of Cortex's claims under Section 101, it should dismiss Cortex's claims for willful, induced, and contributory patent infringement.

## II.    BACKGROUND

### A.    The Asserted Patents

Each Asserted Patent is titled "File Format and Platform for Storage and Verification of Credentials," shares a common specification and figures,[3] and claims priority to the same December 21, 2012 Provisional Application, also titled "File Format and Platform for Storage and Verification of Credentials," which is incorporated by reference into the Asserted Patents. *See* Dkts. 25-1 to 25-

---

[3] All citations to the '531 Patent also refer to the corresponding material in all the other Asserted Patents unless otherwise indicated.

1   4 (FAC Exs. 1-4).

2        The Asserted Patents all describe an "Officially Verifiable Electronic Representation

3   (OVER) File" that "may provide a secure file format and platform for the storage and verification

4   of key user or consumer credentials." *See* FAC Ex. 1 ('531 Patent) at 3:50-53.  The term "Officially

5   Verifiable Electronic Representation (OVER) File" is not a term of art.  Rather, it is a coined term

6   unique to these patents, and used only to describe the generic idea of a credential.  The Asserted

7   Patents state that the "OVER File credentials may comprise any officially verifiable electronic

8   credential, such as, for example a government issued identification such as a driver's license, non-

9   driver's identification card, or professional license" and "may also comprise privately issued

10   credentials, such as, for example, employee identification cards, merchant loyalty cards, access

11   cards, insurance credentials, transportation credentials, or any other credential that may be

12   electronically verified by an issuing agency." *Id.* at 3:65-4:6.  The Asserted Patents, however, do

13   not describe any new technology for generating, storing, or verifying the OVER File credentials.

14        Instead, the Asserted Patents generally describe a "platform" with "three main components,

15   an OVER File storage client 4, an OVER File third party client 6, and an OVER File generation and

16   authorization engine 8," alternatively called the "OVER File Generation and Verification Engine."

17   *Id.* at 3:53-57; *see also id.* at Fig. 1:

18

19

20

21

22

23

24

25

26

27



28   The Asserted Patents state that an "OVER File database 128 may comprise an OVER File generation

and verification engine." *Id.* at 6:16-18.  Further, the "OVER File generation and verification engine 8 may be executed by *any* suitable system" (*id.* at 5:42-44) and "may operate on a remote server." *Id.* at 4:32-34; *see also id.* at 5:54-59 ("Although the various embodiments of the OVER File generation and verification engine 8 are discussed with respect to an OVER File database, those skilled in the art will recognize any suitable architecture and/or datastore may be employed by the OVER File generation and verification engine.").  The OVER File generation and authorization engine "may generate OVER File credentials in response to requests from" either of the other two main components, and these credentials can be generated from "data provided by a user, a third party, or an issuing agency or authority." *Id.* at 4:25-30.  The OVER File generation and verification "may communicate . . . using *any* suitable network or communication system" with the client devices that comprise the other two components of the system.  *Id.* at 4:35-37.

The OVER File storage client component is described in similarly broad terms; it "may be executed by a user device to store generated OVER Files representative of the user's credentials," "may initiate generation of new OVER Files, and may comprise a display function for displaying stored user credentials for third-party verification."  *Id.* at 3:57-64.  The Asserted Patents state that the OVER File storage client "may be included as part of a virtual wallet platform or may comprise a stand-alone user application."  *Id.* at 3:59-61; *see also id.* at 4:51-54.

The OVER File third-party client likewise may "comprise a stand alone application executed by [a] third party device" or "may comprise an application program interface (API) configured to provide OVER File credential verification through a third party application."  *Id.* at 4:18-24; *see also id.* at 7:54-59.  This component "may allow a third party to scan or otherwise interact with OVER File credentials displayed on a user device" and "may contact a remote server, such as the OVER File generation and verification engine 8, for verification of the displayed user credential." *Id.* at 4:10-15.

The Asserted Patents do not describe the use of the OVER File credentials in any more certain terms.  The user starts the verification process by opening the OVER File storage client, accessing its "credential features," and selecting "a stored OVER File credential for display on the user device," after which "[c]redential information stored in the OVER File may be displayed." *Id.*

at 7:32-41.  The user then may present the displayed credential to a third party for verification, including a "displayed information code [that] may comprise a credential identifier, such as, for example, a credential identification number." *Id.* at 7:48-50.  The third party then may select a "scanning option" to scan the information code displayed on the user device," and the third-party application transmits that information code.  *Id.* at 7:59-8:7.

Then the OVER File database, which comprises the OVER File generation and verification engine and "may store copies of all generated OVER File credentials . . . in ***any*** suitable manner," "may compare information received from the third-party verification application, such as, for example, a credential identifier, with the OVER File credentials stored in the OVER File database 228." *Id.* at 8:12-26.  Finally, the third-party client is provided with an indicator whether the OVER File credential is valid.  *Id.* at 8:26-28.

As the provisional application incorporated into the Asserted Patents explains:

> [A] user may attempt to enter an age-restricted location, such as a bar.  A security guard at the bar may require identification and verification of age before allowing the user to enter.  The user may select to display an OVER File containing a government issued identification, such as, for example, a driver's license.  The security guard may use a scanning device to scan a two-dimensional information code stored as part of the OVER File and displayed on the user's device.  The scanning device may contact the OVER File database to verify the validity of the OVER File.  A status of the OVER File, valid or invalid, may be transmitted to the scanning device.  If the OVER File is valid, a portion of the credentials contained in the OVER File may be displayed on the scanning device.

Ex. 2 ("'731 Provisional") ¶ 23.

Through multiple columns of text, the shared specification of the Asserted Patents emphasizes that the processes described are not limited to any particular hardware or software.  *See* '531 Patent at 19:4-20:67; *see, e.g.*, *id.* at 19:26-31 ("Although some embodiments may be illustrated and described as comprising functional components, software, engines, and/or modules performing various operations, it can be appreciated that such components or modules may be implemented by one or more hardware components, software components, and/or combinations thereof.").

**B.    Alleged Communications Between Cortex and CyberSource or Visa**

In the FAC, as in its initial Complaint (Dkt. 1), Cortex alleges that its representatives

1   communicated with Visa and Visa's subsidiary in 2013 and 2016-2017.   FAC ¶¶ 10, 11.

2   Specifically, Cortex asserts that in 2013, it met with representatives from CyberSource—a payment

3   platform owned by Visa—"to discuss a possible business or commercial relationship between

4   Cortex and Visa[,]" and the parties entered into a non-disclosure agreement.  *Id.* ¶ 10.  While Cortex

5   alleges that it presented its "OVER File technology" to Visa in 2013, Cortex acknowledges that this

6   presentation did not address the Asserted Patents—since none of the Asserted Patents had issued at

7   that time.  *Id.*; *see* FAC Exs. 1-4.  In these communications, Cortex alleges only that it "informed

8   CyberSource that it had filed a patent application for the OVER File technology[.]"  FAC ¶ 10.

9        Cortex further contends that in "April 2016," it emailed Visa information on the "OVER

10  File technology" in response to a request from Visa for "a summary of potential 'synergies' between

11  the two companies, again in the context of a possible business relationship."  *Id.* ¶ 11.  Inexplicably,

12  as in its initial Complaint, Cortex continues to withhold the purported email by failing to attach it to

13  the FAC but alleges that the email provided "a three-page overview of Cortex's technologies and

14  their potential application to Visa's Digital Enablement Program" and a "one-page summary of

15  potential synergies between Cortex and Visa[.]"  *Id.*

16       Cortex selectively quotes from these unattached documents to allege that Cortex informed

17  Visa that its "'Tokenization capabilities can add significant value, IP, and capacities to the Visa

18  Token Service'" and could be "'an effective leverage tool for Visa across the board.'"  *Id.*  Notably,

19  the FAC fails to include a single quotation from the documents identifying the title, patent number,

20  or claim language of any of the Asserted Patents.  Indeed, Cortex merely asserts, without quotation,

21  that the documents "expressly stated that Cortex had been issued an OVER File patent[.]"  *Id.*

22  Cortex appends a citation to the only patent issued at the time—the '531 Patent.  *Id.*  But Cortex

23  does not allege that it actually identified the '531 Patent to Visa in its communications.  *Id.*

24       Again, without any substantiation, Cortex lastly alleges that in early 2017, Cortex emailed

25  "substantially the same information" to Visa's Executive Vice President.  FAC ¶ 11.  All of the

26  Asserted Patents except for the '531 Patent issued after this alleged communication.  Cortex does

27  not allege any further contact of any kind between Cortex and Visa (or CyberSource) before the

28  filing of this action.

1   **III.    LEGAL STANDARD**

2       **A.    Dismissal Under Federal Rule of Civil Procedure 12(b)(6)**

3       "Under Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint is required if the

4   complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."

5   *WiNet Labs*, 2020 WL 409012, at *2.   To avoid dismissal, plaintiff must allege "facts to state a

6   claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

7   The standard "requires more than labels and conclusions, and a formulaic recitation of a cause of

8   action's elements will not do." *Id.* at 555.   "While legal conclusions can provide the complaint's

9   framework, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 664

10  (2009).   Conclusory allegations are "not entitled to be assumed true." *Id.* at 681.

11      **B.    Unpatentable Subject Matter under 35 U.S.C. § 101**

12      The Supreme Court has recognized that "abstract ideas" are an exception to patentable

13  subject matter identified by 35 U.S.C § 101 and established a two-step framework to determine

14  whether a claim falls within this exception.   *Alice*, 573 U.S. at 217-18.   First, the Court must

15  "determine whether the claims at issue are directed to a patent-ineligible concept." *Id.*   Second, the

16  Court "must examine the elements of the claim to determine whether it contains an inventive concept

17  sufficient to transform the claimed abstract idea into a patent-eligible application." *Id.* at 221.

18      "Eligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts." *SAP

19  Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018).   Thus, "this question may be,

20  and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts,

21  considered under the standards required by that Rule, require a holding of ineligibility under the

22  substantive standards of law." *Id.*   Indeed, early disposal of such claims can "spare both litigants

23  and courts years of needless litigation." *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 996 (Fed.

24  Cir. 2014).

25      **C.    Knowledge of Asserted Patents**

26      Knowledge of the asserted patent and infringement thereof is a prerequisite to willful,

27  induced, and contributory patent infringement. *See Dental Monitoring SAS v. Align Tech., Inc.*, No.

28  22-7335-WHA, 2023 WL 4297570, at *6 (N.D. Cal. June 30, 2023).   Courts in this district and

others have held that, in the absence of pre-suit knowledge, there can be no claim for willful or indirect infringement, for either pre- or post-suit conduct, because the "purpose of a complaint is to obtain relief from an existing claim and not to create a claim." *Sonos, Inc. v. Google LLC*, 591 F. Supp. 3d 638, 648 (N.D. Cal. 2022) (quoting *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 251 (D. Del. 2021)).  Although not the unanimous view, courts in this district have pointed out "allowing the complaint to serve as notice would circumvent the worthwhile practice to send a cease-and-desist letter before suit," which "can efficiently lead to a resolution and save vast resources." *Sonos*, 591 F. Supp. 3d at 644, 646; *see also GoTV Streaming, LLC v. Netflix, Inc.*, No. 2:22-cv-7556-RGK-SHK, 2023 WL 2627016, at *3 (C.D. Cal. Feb. 16, 2023) ("[A]mbushing defendants with willful infringement claims instead of typical cease-and-desist letters would effectively deny defendants the opportunity to meaningfully evaluate and potentially cease the allegedly infringing conduct").  Consistent with the requirement for pre-suit notice, this Court has dismissed an inducement claim where it was implausible that the accused infringer received pre-suit notice of the asserted patent.  *Fortinet Inc. v. FireEye Inc.*, No. 5:13-cv-2496-EJD, 2014 WL 4955087, at *5 (N.D. Cal. Sept. 30, 2014) (finding it "facially implausible to allege induced patent infringement given [asserted] patent was issued 3 days prior to filing the FAC").

## IV.   ARGUMENT

### A.   The Asserted Patents Are Invalid Under Section 101

#### 1.   Claim 1 of the '531 Patent, Claim 15 of the '854 Patent, Claim 1 of the '859 Patent, and Claim 1 of the '973 Patent Are Representative for Purposes of Section 101

Given the number of Asserted Patents and their related nature, analysis of representative clams is appropriate.  The Supreme Court, the Federal Circuit, and district courts routinely find claims ineligible based on representative claims.  *See, e.g.*, *Alice*, 573 U.S. at 224 (treating one claim as representative of 200+ claims); *Sanderling Mgmt. v. Snap Inc.*, 65 F.4th 698, 701 (Fed. Cir. 2023) (affirming district court's dismissal, *see Sanderling*, No. 21-cv-2324-GW-JCX, 2021 WL 3161175, at *4 (C.D. Cal. May 18, 2021),, which relied on a single claim from each of three patents to represent dozens of claims); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016) ("lengthy and numerous claims" of three patents represented by one claim); *Wildseed Mobile*

1   *LLC v. Google LLC*, No. 22-cv-4928-WHO, 2023 WL 3898979, at *2 (N.D. Cal. June 7, 2023)

2   (treating one claim as representative for three patents each containing multiple claims "because the

3   claims are substantially similar and are all linked to the same abstract idea").

4          Here, claim 1 of the '531 Patent, claim 15 of the '854 Patent, claim 1 of the '859 Patent, and

5   claim 1 of the '973 Patent are representative (the "Representative Claims").  The remaining claims

6   are substantially similar and relate to the same abstract idea.  The Representative Claims are the

7   only claims specifically referenced in the FAC, the FAC fails to discuss any other claims, and the

8   deficiencies in these claims are equally applicable to the other claims.

9          **2.    *Alice* Step One:  The Representative Claims Are Directed to Abstract**
                    **Ideas**

10         Step One looks holistically at the claims' overall "focus" and "character as a whole."  *Elec.*

11  *Power Grp.*, 830 F.3d at 1353.  The Federal Circuit has explained that for computer-based claims,

12  the first step of *Alice* asks whether the claims focus on a "specific means or method that improves

13  the relevant technology," which may pass muster under Section 101, or on a "result or effect that

14  itself is the abstract idea and merely invoke[s] generic processes and machinery," which cannot.

15  *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016). The Representative Claims fall

16  squarely within the latter category.

17         Cortex alleges it "provides a mobile-wallet solution that is both secure and convenient" and

18  stores information "on a mobile device without the associated risk if this data is accessed by

19  hackers."  FAC ¶ 9.  Cortex claims to accomplish this through a "token" and the encryption of the

20  "OVER file."  *Id*.   However, the term "token" appears nowhere in the claims or even the

21  specification, and encryption is not recited in the claims either; the specification merely states that

22  the "OVER File ***may be*** encrypted."  '531 Patent at 7:8-11.  Cortex's vague and implausible

23  allegations confirm the Asserted Patents are not directed to any technological improvement.

24         "Stripped of excess verbiage," the claimed concept of the Asserted Patents is

25  straightforward.  *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1256-57 (Fed. Cir.

26  2016).  The claims are directed to the abstract idea of issuing and checking credentials.  These are

27  not improvements in computer processes, but rather long-practiced human activities.  Claim 1 of the

28

'531 Patent, for example, describes storing a record of a credential relating to a person's identity or qualification in a central place (*i.e.*, in the OVER "generation and verification engine"), making and sending a representation of that credential to the person at their request (*i.e.*, "to the OVER file storage client device of the user"), and verifying whether the credential is valid at the request of someone else who has viewed the representation of the credential (*i.e.*, "from an OVER file third-party client verifying device" and "based on a scan associated with the OVER file"). *See* FAC Ex. 1 at claim 1. This is nothing more than the longstanding activity of, for example, the Department of Motor Vehicles keeping records of licensed drivers, the DMV issuing a license card to a licensed driver, and the DMV comparing the license number to their records after receiving a call from a police officer who reads the license number off the card. *See, e.g.*, *id.* at 8:44-46 (acknowledging DMVs keep such databases). In addition to issuing and checking driver's licenses, schools have long provided graduates with diplomas and school transcripts, and prospective employers have checked the validity of those documents by contacting the schools. The claim is directed to nothing more than longstanding human activity.

The other claims of the Asserted Patents fare no better. Claim 1 of the '859 Patent merely adds that the user and third-party's devices are "Near Field Communication (NFC) enabled device[s]," and that the scan of the user's device is "a Near Field Communication (NFC) protocol-based communication. *See* FAC Ex. 3 at claim 1. The Asserted Patents do not purport to have invented NFC, and, in fact, a review of the specification confirms NFC was nothing more than a conventional computer technique. *See* '531 Patent at 12:10-15 ("In another embodiment, the OVER File storage client may generate an information code in the form of a networked or radio transmission, such as, for example, a Near Field Communication (NFC) or Bluetooth, or in the form of sensor information, such as, for example, a bump."); *see also Samsung Elecs. Co. v. Blaze Mobile, Inc.*, No. 21-cv-2989-EJD, 2023 WL 3510380, at *9 (N.D. Cal. May 16, 2023) (dismissing claims for infringement of NFC security patents under Section 101).

Claim 15 of the '854 Patent adds a "second OVER file stored on a second OVER file client device of the user," "a second verifying request," and "a second authentication message," but there is nothing inventive about having and checking two forms of identification instead of one. *See* FAC

Ex. 2 at claim 15.  Similarly, claim 1 of the '973 Patent adds "requesting, by the processor of the OVER engine to the issuing agency, an agency authentication to validate the credential, wherein the issuing agency issued the credential of the user," but adding another layer of checking credentials does not take the claims out of the realm of the abstract.  This is no more inventive than, for example, checking a cab driver or truck driver's license or other credentials with their dispatch, and the dispatch, in turn, checking with the issuing agency.  Because the Asserted Patents do nothing more than claim the basic activity of using a credential "over the Internet," they are directed to an unpatentable abstract idea.  *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715-16 (Fed. Cir. 2014) ("implement[ing] the abstract idea with routine, conventional activity" and "invocation of the Internet" cannot save abstract claims).

Courts routinely find similar claims directed to verification of identity or authentication generically with computers to be directed to abstract ideas.  *See Universal Secure Registry LLC v. Apple Inc.,* 10 F.4th 1342, 1353 (Fed. Cir. 2021) ("Moreover, as we have previously explained, verifying the identity of a user to facilitate a transaction is a fundamental economic practice that has been performed at the point of sale well before the use of POS computers and Internet transactions."); *Secured Mail Sols., LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 907, 910 (Fed. Cir. 2017) (claims on "method for verifying the authenticity of the mail object" unpatentable where they stated "that various identifiers are affixed to a mail object, stored in a database, scanned from the mail object, and retrieved from the database," but no "special rules or details of the computers, databases, printers, or scanners [were] recited"); *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1017 (Fed. Cir. 2017) (claims on process of "(1) receiving identity data from a device with a request for access to resources; (2) confirming the authenticity of the identity data associated with that device; (3) determining whether the device identified is authorized to access the resources requested; and (4) if authorized, permitting access to the requested resources").

*Smart Authentication IP, LLC v. Electronic Arts, Inc.* is instructive.  402 F. Supp. 3d 842, 844-45 (N.D. Cal. 2019).  In that case, the patent at issue related to "multi-factor authentication of users over multiple communications media" and specifically disclosed a three-part "interaction between a user, an ASP [authentication service provider] client, and an ASP." *Id.* The claim at issue

1    required, *inter alia*, an "initiation of a transaction by the user with the [ASP] client," the ASP client

2    submitting a request to authenticate the user, and the user communicating with the user

3    authentication service through a different communications medium and device than that employed

4    to initiate the transaction. *Id.* at 846. Although the claim at issue was lengthy, the court noted "the

5    use of a third party intermediary to confirm the identity of a participant to a transaction" is an abstract

6    idea, and found the claim at issue abstract because it recited "a method for authenticating a user in

7    more than one way over multiple electronic mediums but does not provide any unconventional,

8    patentable combination, such that straightforward steps to be done on a computer are transformed

9    into something non-abstract." *Id.* at 851-853. Similarly, here, the claims are directed to a user (*e.g.*,

10   the "OVER file storage client device of the user") being authenticated through communicating with

11   an intermediary (*e.g.*, the "OVER engine") *and* communicating with a third-party that is

12   communicating separately with the intermediary (*e.g.*, the "OVER file third-party client verifying

13   device")—all through using straightforward steps executed on a computer. This does not transform

14   the idea of checking credentials into something non-abstract.

15       Moreover, the intrinsic record confirms the abstract nature of the Asserted Patents. As

16   discussed above, in the provisional application, the example used of a security guard at a bar

17   mentions a "database," "scanning device," and "two-dimensional information code," but does not

18   mention any improvement in or non-conventional use of these techniques. Ex. 2 ¶ 23. Instead, the

19   example simply describes a bouncer verifying an ID but with the addition of the most conventional

20   computer functionality. Indeed, the provisional disclaims any limitation on what technology may

21   be used, stating its "components or modules may be implemented by one or more hardware

22   components, software components, and/or combination thereof." *Id.* ¶ 43.

23       In sum, the Asserted Patents are not "directed to a specific improvement to the way

24   computers operate." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016)

25   (upholding claims focusing "on the specific asserted improvement in . . . capabilities" of a database).

26   Instead, the claims recite known technologies (client devices, engines) to implement an abstract idea

27   without any improvement to the underlying technology itself. Indeed, the Asserted Patents do not

28   purport to improve the functioning of computers in any way. Because they claim a provision and

1    verification of credentials by a central authority, a process long performed by humans, the claims

2    are directed to abstract ideas under Section 101.  *See Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec.*

3    *Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019) (finding ineligible "quintessential 'do it on a computer'

4    patent" because it merely automates "pen and paper methodologies").

5         Given that both the language of the Representative Claims and other intrinsic evidence make

6    clear that the Asserted Patents describe only abstract ideas long executable both mechanically and

7    electronically, they do not pass muster under *Alice* step 1.

8         **3.    *Alice* Step Two:  The Representative Claims Do Not Recite an
              Inventive Concept**

9

10        At Step Two, the Court determines whether the claims "contain[] an inventive concept

11   sufficient to transform the claimed abstract idea into a patent-eligible application."  *Alice*, 573 U.S.

12   at 221.  An inventive concept is "an element or combination of elements . . . sufficient to ensure that

13   the patent in practice amounts to significantly more than a patent upon the ineligible concept itself."

14   *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1318 (Fed. Cir. 2021).

15        Here, the claims do not include any "inventive concept" that would negate them from being

16   patent ineligible.  The claims are written in functional language and include only generic computer

17   functionality.  The Asserted Patents do not (and cannot plausibly) purport to have invented tokens

18   or encryption.  Cortex alleges in the FAC that it stated to Visa in 2016 that "its OVER File IP"

19   "cover[ed] every aspect of provisioning a representative credential, that can be scanned and

20   verified."  FAC ¶ 11.  Thus, according to Cortex's own allegations, its Asserted Patents would

21   preempt "***every aspect***" of the abstract idea of "provisioning a representative credential, that can be

22   scanned and verified."  *Id.*  The concern that abstract ideas will be preempted undergirds the

23   Supreme Court's Section 101 jurisprudence.  *Alice*, 573 U.S. at 223.  Cortex is not "entitled to

24   wholly preempt" provisioning, scanning, and verifying representative credentials.  *Inventor*

25   *Holdings*, 876 F.3d at 1378.  All of Cortex's claims should be dismissed with prejudice.

26        The claims also repeatedly append the term "OVER" to conventional computer components

27   such as an "engine" and "client device."  This cannot resuscitate the claims, however.  The claims

28   describe the implementation of "OVER" in the most conventional computer terms and results-based

1  functional language and do "not sufficiently describe how to achieve these results in a non-abstract

2  way." *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir.

3  2017). "The mere fact that the inventor applied coined labels"—like OVER generation and

4  verification engine, OVER file storage client, and OVER file third-party client verifying—"does

5  not make the underlying concept inventive." *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850

6  F.3d 1332, 1339, 1342 (Fed. Cir. 2017) (finding "'management record types' ('MRTs') and

7  'primary record types' ('PRTs')" did not change analysis because specification showed "PRT is a

8  simple data structure that contains unspecified data extracted from XML documents and an MRT is

9  merely a collection of PRTs"); *see also Smart Authentication*, 402 F. Supp. 3d at 854. As discussed

10 above, the shared specification of the Asserted Patents describes these only as generic computer

11 components that implement issuing, storing, and verifying credentials in a conventional way. *See*

12 Sec. II.A *supra*. Some of the claims reference NFC communication, but the claims only use it in a

13 conventional way, and the Asserted Patents do not (and cannot) purport to have invented it. *See*

14 '531 Patent at 12:10-15.

15     Even if the Representative Claims were considered an "ordered combination," that would

16 not change the outcome. *See Alice*, 573 U.S. at 225. Nothing in the claims "purport[s] to improve

17 the functioning of the computer itself" or to "effect an improvement in any other technology or

18 technical field." *Id.* at 210. Nor are the claims "necessarily rooted in computer technology" to

19 "overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC*

20 *v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). There is nothing unique or transformative

21 in the way that the claims implement the abstract idea.

22 **B.     Alternatively, Cortex's Claims for Willful and Indirect Infringement Should Be Dismissed**

23

24     **1.     Cortex Fails to Plead Pre-Suit Knowledge of Any of the Asserted Patents or Infringement Thereof**

25     Cortex has not plausibly alleged that Visa had pre-suit knowledge of any of the Asserted

26 Patents, and its claims for willful, induced, and contributory infringement fail for this reason alone.

27 Pre-suit knowledge of the Asserted Patents and their infringement is a prerequisite for claims for

28 willful and indirect patent infringement. *See, e.g.*, *Splunk Inc. v. Cribl, Inc.*, No. 22-cv-07611-

WHA, 2023 WL 2562875, at *5 (N.D. Cal. Mar. 17, 2023); *see also Fortinet*, 2014 WL 4955087, at *4 (inducement claim "implausible" where pre-suit knowledge of issued patent was unlikely).  To meet this requirement, there is a "need for a notice letter in almost all circumstances." *Splunk*, 2023 WL 2562875, at *3 (collecting cases).  Here, there is no such notice letter or any other plausible facts that could meet the knowledge requirement.

As to the '854, '859 Patent, and '973 Patents, Cortex has conceded, as it must, that given that these patents did not issue until ***after*** the last alleged pre-suit communication between Cortex and Visa or CyberSource, Cortex is not alleging pre-suit knowledge of any of these patents.  *See* Dkt. 30 at 7.  Therefore, Cortex cannot make out any claim for willful, induced, or contributory infringement of these patents.  *See, e.g.*, *Dental Monitoring*, 2023 WL 4297570, at *6 (A "complaint cannot, standing alone, serve as notice for purposes of willful and indirect infringement.").

As to the '531 Patent, Cortex does not allege that it sent a notice letter to Visa or its subsidiary CyberSource.  Instead, Cortex alleges that in "April 2016, representatives from Visa requested from Cortex a summary of potential 'synergies' between the two companies," and in response, Cortex sent documents relating to "Cortex's technologies" and "potential synergies between Cortex and Visa."  FAC ¶ 11.  Although the FAC includes quotes from these documents, Cortex tellingly does not include a single quote referencing the '531 Patent.  Cortex merely asserts that one of the documents "expressly stated that Cortex had been issued ***an*** OVER File Patent," but Cortex does not provide any quotation of this purported statement.  *Id.* (emphasis added).  Cortex then cites the '531 Patent as the "OVER File patent" that was issued at the time, but never alleges that the '531 Patent was cited in the communications.  *Id.*

These allegations do not plausibly allege Visa had knowledge of the '531 Patent at the time.  Plaintiff's crafty pleading never states that Cortex squarely identified the '531 Patent to Visa.  Cortex never alleges, for example, that it provided Visa a copy of the '531 Patent or the patent number, or that it otherwise directed Visa to the '531 Patent specifically.  Even viewing the allegations in the light most favorable to Cortex, the FAC at most suggests Cortex informed Visa that there may exist ***some*** patent for "OVER File technology," without putting Visa on notice of any specific patent.  Such conclusory and unclear allegations are insufficient to "state a claim to relief

1   that is plausible on its face." *Iqbal*, 556 U.S. at 678; *see also Mich. Motor Techs. LLC v. Volkswagen*

2   *Aktiengesellschaft*, 472 F. Supp. 3d 377, 384 (E.D. Mich. 2020).  Knowledge that a patentee may

3   have related patent protection, without more, is routinely held insufficient "even to plausibly allege

4   knowledge of a particular asserted patent."  *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 330 F.

5   Supp. 3d 574, 608 (D. Mass. 2018) (collecting cases).

6       Moreover, even if Cortex had sufficiently alleged knowledge of the '531 Patent (which it

7   has not), "it fails to allege [Visa] had pre-suit knowledge of *infringement*."  *MasterObjects, Inc. v.*

8   *Amazon.com, Inc.*, No. 20-cv-8103-WHA, 2021 WL 4685306, at *4 (N.D. Cal. Oct. 7, 2021)

9   (emphasis in original).  "Knowledge of infringement does not arise from knowledge of the asserted

10  patent as a matter of course; it must be the subject of discrete, albeit related, allegations."  *Id.*

11  "[A]llegations that a patent owner sent a letter merely notifying a third party of the existence of a

12  particular patent, ***without accusing that third party of infringement***, is, by itself, insufficient."  *Id.*

13  (collecting cases).

14      The FAC does not allege that Cortex accused Visa (or CyberSource) of infringement in any

15  pre-suit communication or otherwise allege facts plausibly demonstrating that Visa knew either of

16  any direct infringement, or that it had induced acts constituting infringement.  All alleged pre-suit

17  communications between Visa and Cortex occurred to "discuss a possible business or commercial

18  relationship between Cortex and Visa" and consider "potential 'synergies' between the two

19  companies."  FAC ¶¶ 10-11.  Cortex never alleges that it accused Visa of infringement in pre-suit

20  communications, much less the nature and manner of infringement.  Instead, the focus was on

21  "Cortex's technologies" and how they could apply to "Visa's Digital Enablement Program," a suite

22  of functionalities encompassing all manner of digital processing.  *Id.* ¶ 11.

23      Alleged statements that Cortex's capabilities could "add significant value, IP, and capacities

24  to the Visa Token Service" and that "Enhanced Tokenization Capabilities" could provide a

25  "[c]ritical supporting IP portfolio" do nothing to change this analysis.  *Id.* The references to IP are

26  vague and could mean multiple things, including non-patent forms of IP (*i.e.*, copyrights,

27  trademarks, trade secrets) or patents covering any number of technologies, products, or product

28  features.  Moreover, these references to "IP" are in the context of the value of Cortex's technology,

1    rather than any alleged infringement by Visa of any issued patent. *Id.* Cortex's allegation that the

2    communications mentioned "infringement" by unnamed "Wallet Solution providers" is equally

3    unavailing. Cortex does not allege what is meant by "Wallet Solution," who the "Wallet Solution

4    providers" were, that Visa offered an infringing "Wallet Solution," or what aspect, if anything, of

5    Visa's alleged "Wallet Solution" was infringing. *Id.*

6        Such vague and conclusory allegations of "notice" are routinely found insufficient to

7    demonstrate knowledge of infringement, particularly when plaintiffs elect not to provide the

8    underlying communication. *See e.g.*, *Fluidigm Corp. v. IONpath, Inc.*, No. 19-cv-5639-WHA, 2020

9    WL 408988, at *5 (N.D. Cal. Jan. 24, 2020) ("Patent owners did allegedly notify defendant of the

10    '104 patent. But, notably, the complaint never alleges that the letter accused defendant of

11    infringement, much less detailed *how* defendants allegedly infringed"); *Bench Walk Lighting LLC

12    v. LG Innotek Co.*, 530 F. Supp. 3d 468, 492 (D. Del. 2021) (finding purported notice letter

13    insufficient to establish knowledge when, among other things, it "does not appear to reference most

14    of the Accused [] Products," and it "includes no attempt to describe *how* it is that [the accused

15    product] is said to be infringing the patents that are specifically referenced therein"). Here, dismissal

16    is appropriate as Plaintiff has inexplicably and repeatedly failed to attach the alleged

17    communications to the operative complaint. *See Michigan Motor Techs.*, 472 F. Supp. 3d at

18    (dismissing willful infringement based on communication where plaintiff "did not attach a copy of

19    the referenced letter" and "never specified what the letter stated").

20        Cortex's FAC is devoid of allegations that its pre-suit communications indicated, much less

21    adequately explained, that the accused product in this case infringed any specific Cortex intellectual

22    property, let alone any of the Asserted Patents. All of Cortex's claims of indirect or willful

23    infringement should be dismissed.[4]

24

25 _____

26 [4] In the event the Court does not find Visa's lack of plausible knowledge of the Asserted Patents

27 and alleged infringement as a bar to *all* indirect and willful infringement claims, at a minimum the

28 Court should dismiss Cortex's *pre-suit* indirect and willful infringement claims for the reasons

(continued...)

1

2

### 2.     Cortex Fails to Plead Egregious Misconduct as Required for Willful Infringement

3

Even if the Court does not find the lack of plausible pre-suit knowledge of the Asserted

4    Patents or infringement as an absolute bar to Cortex's claims of willful, induced, and contributory

5    infringement, Cortex's willful infringement claims (as well as the indirect infringement claims

6    discussed further below) should be dismissed for additional reasons and deficiencies.

7

As an initial matter, many courts find a lack of pre-suit knowledge to bar any willful

8    infringement claim even if they allow the complaint to serve as notice for indirect infringement

9    claims.  *See Sonos*, 591 F. Supp. 3d at 648 ("Falling in between, some district court judges that have

10   not permitted knowledge arising from a pleading to suffice for a willful infringement claim have

11   gone the other way for indirect infringement.").  "The policies that govern our patent system make

12   the requirement of pre-suit knowledge of the asserted patents especially warranted for enhanced

13   damages claims."  *Bos. Sci. Corp. v. Nevro Corp.*, 560 F. Supp. 3d 837, 844 (D. Del. 2021).  Indeed,

14   pre-suit knowledge is embedded in the concept of "deliberate or intentional infringement" required

15   for willful infringement.  *See Plexxikon Inc. v. Novartis Pharms. Corp.*, 631 F. Supp. 3d 823, 843

16   (N.D. Cal. 2022); *Slot Speaker Techs., Inc. v. Apple, Inc.*, No. 13-cv-161-HSG, 2017 WL 4354999,

17   at *2 (N.D. Cal. Sept. 29, 2017) (denying amendment to add willful infringement as futile where

18   "Defendant's post-suit manufacturing and sales [were] the exclusive evidence of Defendant's

19   willful infringement").

20

Moreover, Cortex simply has not alleged the sort of "egregious cases of misconduct beyond

21   typical infringement" generally required for a willful infringement claim to survive dismissal.

22   *WiNet Labs*, 2020 WL 409012, at *5.  Cortex's allegations as to willful infringement read in full:

23

24

> After speaking with representatives from Cortex about the '531 Patent who informed
> Visa that the patent was infringed by nearly all wallet-solution providers on the
> market, Visa nonetheless continued to sell and offer for sale infringing products,
> including the Visa Token Service.

25

26

_____

27   stated in this Section.  In addition, the Court should dismiss these claims for *post-suit* conduct for

28   the reasons discussed *infra*.

> Visa has infringed and continues to infringe the '531 Patent despite the fact that it knew that its conduct amounted to infringement of the '531 Patent.

FAC ¶¶ 101-102.  First, as discussed above, Cortex has not plausibly alleged that Cortex and Visa or CyberSource spoke "about the '531 Patent" versus "Cortex IP" generally.  Second, even if Cortex did, its allegations are still insufficient to plead willful infringement because they fall short of the required "specific factual allegation about Defendant's subjective intent or any other aspects of Defendant's behavior that would suggest Defendant acted 'egregiously.'"  *WiNet Labs*, 2020 WL 409012, at *5.

Cortex's willful infringement claims should be dismissed.

### 3. Cortex Fails to Plead Specific Intent to Induce Infringement

The failure to plausibly plead specific intent also dooms Cortex's inducement claims. Inducement requires "specific intent to cause a third party to infringe."  *Fortinet*, 2014 WL 4955087, at *5.  "[S]imply recit[ing] the legal conclusion that Defendants acted with specific intent[]" fails to plead "facts that would allow a court to reasonably infer that Defendants had the specific intent to induce infringement."  *Addiction & Detoxification Inst. L.L.C. v. Carpenter*, 620 F. App'x 934, 938 (Fed. Cir. 2015).  While Cortex attempts to dress its FAC with more detail than the bare-bones links cited in the initial Complaint, Cortex's superficial descriptions fail to add any substance to Cortex's allegations.  Cortex continues to allege inducement based on general references to Visa and CyberSource's advertisements, product descriptions, operating manuals, and instructional documents without reciting any specific facts that can plausibly show the required specific intent to cause infringement.  *See* FAC ¶¶ 27, 50, 70, 93.  Cortex's new discussions of these cited sources underscore that they merely describe the business of tokenization and its potential uses, not information about the underlying technology, and certainly not any reference to the patent claims Cortex asserts are infringed or Cortex's alleged "OVER File Technology."  *Id.*

Indeed, the totality of Cortex's allegations regarding Visa and CyberSource's websites and advertisements is that they:

> "provide[] 'application program interfaces' (i.e., software) and offer[] tutorials and webinars on how to implement Visa's technological solutions, including the Visa Token Service";

"provide[] instructions to 'Issuer Banks,' 'Merchants,' and 'Independent Developers' on how to implement Visa Token Service, and suppl[y] application program interfaces that aid in tokenization processes[]";
"advertise[] that [Visa's] "'tokenization technologies can empower banks, merchants and the wider payments ecosystem to boost authorization, drive innovation and create new digital commerce experiences for everyone'";
"advertise[] to retailers 'a suite of fast, comprehensive solutions' to 'accelerate your business's adoption of emerging network tokenization technologies[]'";
"tout[] the security and economic benefits of tokenization and offer[] 'modular solutions' to businesses around the globe[]"; and
"provide detailed instructions to purchasers of CyberSource's 'Token Management Service' software on how to implement a tokenization service." *Id.*

These allegations do not suggest that Visa specifically intended to cause a third party to ***infringe*** the Asserted Patents; rather, they merely suggest that Visa intended to ***market and sell*** its services in the ordinary course, completely divorced from any intent to induce any infringement of undefined technology purportedly disclosed in the patents.    Indeed, Cortex's allegations are entirely disconnected from the Asserted Patents or their limitations.

Cortex's allegations are like those found insufficient in *Fluidigm*; they "boil[] down to defendant's papers and brochures describ[ing] infringement, [and] thus [showing] specific intent to infringe." 2020 WL 408988, at *3.  However, "[m]erely describing an infringing mode is not the same as recommending, encouraging, or promoting." *Id.* (quoting *Takeda Pharms. v. West-Ward Pharm.*, 785 F.3d 625, 631 (Fed. Cir. 2015)).   Moreover, the FAC's allegations—"broad descriptions of the field in which patent owner practices, without allegations showing the article and brochure encouraged the practice of each claim limitation—are too generic to plausibly conclude defendant's 'affirmative intent' to *induce others* to infringe." *Fluidigm*, 2020 WL 408988, at *3 (emphasis in original).

Cortex fails to draw any connection between the Visa materials and the practice of each claim limitation or encouragement thereof.   "Where defendants have not touted the benefits of the accused products in ways that track the asserted patents, courts generally do not infer specific intent." *Memory Integrity, LLC v. Intel Corp.*, 144 F. Supp. 3d 1185, 1195 (D. Or. 2015); *see also CyWee Grp. Ltd. v. HTC Corp.*, 312 F. Supp. 3d 974, 980 (W.D. Wash. 2018) (finding insufficient assertions that defendants "create and disseminate product manuals, instructions, and marketing materials" when the complaint "offers no specific details about those promotional and instructional

1   materials" to show that defendants intended to induce infringement "rather than simply describ[e]

2   how the [accused products] work"). Because Cortex's citations are merely to "ordinary acts incident

3   to product distribution, such as offering customers technical support or product updates," they

4   cannot establish the requisite intent to infringe. *Memory Integrity*, 144 F. Supp. 3d at 1193.

5          Having failed to allege any facts sufficient to demonstrate inducement in Visa's own product

6   materials, Cortex cites a total red herring—the EMVCo specifications and use guide—and

7   misrepresents language from those materials. Specifically, Cortex purports to quote from the

8   EMVCo use guide that "implementation of this document may violate, infringe, or otherwise

9   exercise the patent … or other intellectual property rights of third parties[,]" (ellipsis in original),

10  but conveniently leaves out the first half of the sentence, which actually reads: "***EMVCo undertakes***

11  ***no responsibility to determine whether any*** implementation of this document may violate, infringe,

12  or otherwise exercise the patent, copyright, trademark, trade secret, know-how, or other intellectual

13  property rights of third parties. . . " *Compare* FAC ¶¶ 27, 50, 70, 93 *with* Dkt. 29-1 at Ex. 1.[5]

14  Plaintiff's material omission was designed to suggest potential infringement where none has ever

15  been communicated, alleged, or established by Cortex in its communications with Visa or otherwise.

16         Moreover, irrespective of Cortex's mischaracterization, the EMVCo materials have no

17  bearing on Visa's specific intent for multiple reasons. *First*, Cortex does not even allege that

18  implementation of the EMVCo specifications infringes the Asserted Patents, nor does it chart or

19  demonstrate any other connection between the EMVCo specifications or use guide and the Asserted

20  Patents. While highlighting the volume, scope, and breadth of the EMVCo specifications totaling

21  106 pages, and the companion guide spanning 187 pages (*see* FAC ¶¶ 27, 50, 70, 93), Cortex fails

22  to tie any specific portion of these voluminous materials to any specific claim of any of the Asserted

23  Patents. *Second*, while Cortex alleges that VTS implements certain tokenization processes

24
_____

25  [5] The "court may consider material submitted as part of the complaint or ***relied upon in the***

26  ***complaint***, and may also consider material subject to judicial notice." *Sepehry-Fard v. Aurora*

27  *Bank FSB*, No. 5:12-cv-871-EJD, 2012 WL 3583249, at *1 (N.D. Cal. Aug. 20, 2012), *aff'd*, 588

28  F. App'x 683 (9th Cir. 2014) (emphasis added).

published by EMVCo (*see* FAC ¶ 16), Cortex does not specify which EMVCo processes VTS implements, and which of those processes, if any, purportedly infringe the Asserted Patents.  *See* FAC ¶¶ 27, 50, 70, 93 (acknowledging that EMVCo "provides guidance on *various ways* in which payment tokens can be used").  *Third*, as Cortex acknowledges in the FAC, Visa is one of multiple members of EMVCo.  Cortex does not, and cannot, allege that EMVCo specifications are established by Visa alone, that Visa and EMVCo are one in the same, or that any tokenization language in EMVCo documents reveals *Visa's* specific intent about all aspects of its unique tokenization services.

Regardless, even if the Court considers EMVCo documents relevant, vague allegations related to unspecified portions of the EMVCo materials fail to establish specific intent to induce infringement of any of the Asserted Patents for the same reasons described *supra* in this Section. Cortex has utterly failed to connect any language in the EMVCo materials with the Asserted Patents in a manner sufficient to demonstrate intent to encourage infringement.  The Court should disregard Cortex's last-ditch effort to salvage its inducement claims with irrelevant and misleading citations to the EMVCo materials.

Accordingly, Cortex's induced infringement claims must be dismissed in their entirety because Cortex fails to identify any (1) known infringement or (2) actions that demonstrate specific intent to induce infringement.

### 4.     Cortex Fails to Plead the Absence of Substantial Non-Infringing Uses As Required for Contributory Infringement

A claim for contributory infringement "must plead *facts* that allow an inference that the components sold or offered for sale have no substantial non-infringing uses."  *Artrip v. Ball Corp.*, 735 F. App'x 708, 713 (Fed. Cir. 2018).  Conclusory allegations that the accused products cannot be used for purposes other than infringement are insufficient.  *See Sonos*, 591 F. Supp. 3d at 648. This is especially true where, as here, Plaintiff's own allegations suggest there are other features or aspects of the accused products besides those that infringe.  *See id.* (dismissing where "operative pleading, in fact, describes [Defendant] as adding infringing 'features' to its products").  Federal Circuit precedent is also clear that allegations regarding noninfringing uses cannot be "tailored too

1    narrowly" to the allegedly infringing feature or use of the accused products to argue there are no

2    noninfringing uses; the patentee cannot "say nothing more than 'if you use this device to perform

3    the patented method, the device will infringe and has no noninfringing uses.'" *In re Bill of Lading*

4    *Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012).

5         Yet, that is precisely what Plaintiff does in the FAC.  The entirety of Plaintiff's contributory

6    infringement claims amount to nothing more than a threadbare recital of elements tailored too

7    narrowly to the "infringing aspects":

8         Visa has indirectly infringed and continues to indirectly infringe the ['531, '854,
          '859, '973] Patent in violation of 35 U.S.C. § 271(c) by selling or offering to sell in
9         the United States, or importing into the United States, the [] Accused Products with
          knowledge that they are especially designed or adapted to operate in a manner that
10        infringes that patent and despite the fact that the infringing technology or aspects of
          the products are not a staple article of commerce suitable for substantial non-
11        infringing use… ***The infringing aspects of*** the [ ] Accused Products can be used only
          in a manner that infringes the ['531, '854, '859, '973] Patent and thus have no
12        substantial non-infringing uses.  The infringing aspects of those instrumentalities
          have no meaningful use other than in payment tokenization, let alone any meaningful
13        non-infringing use.

14   FAC ¶¶ 29, 31, 52, 54, 72, 74, 95, 97.

15        Cortex's assertions simply recite the legal standard for contributory infringement,

16   impermissibly narrow those allegations to the "infringing aspects" of the Accused Products, and

17   clearly fail *Iqbal*'s factual pleading standard.   Plaintiff's claims resemble the hypothetical

18   contributory infringement claim expressly rejected in *In re Bill of Lading*.  *Compare id.* ¶ 31 ("The

19   infringing aspects . . . can be used only in a manner that infringes the [] Patent and thus have no

20   substantial non-infringing uses.") *with In re Bill of Lading*., 681 F.3d at 1338 ("if you use this device

21   to perform the patented method, the device will infringe and has no noninfringing uses.").  Such

22   "boilerplate," circular contributory infringement claims must be dismissed.  *See, e.g.*, *Blackberry*

23   *Ltd. v. Nokia Corp.*, No. 17-cv-155-RGA, 2018 WL 1401330, at *4 (D. Del. Mar. 20, 2018);

24   *Traxcell Techs., LLC v. Verizon Wireless Pers. Commc'ns, LP*, No. 6:20-cv-1175-ADA, 2022 WL

25   299732, at *4-5 (W.D. Tex. Jan. 31, 2022).

26   **V.     CONCLUSION**

27        All of Cortex's claims in this matter should be dismissed with prejudice because all of the

28   Asserted Patents are directed to unpatentable subject matter under 35 U.S.C. § 101.  Alternatively,

1  all of Cortex's claims for willful, induced, and contributory infringement should be dismissed.

2

3  Dated: December 7, 2023

4                                                    By:  */s/ Lucy Yen*

5                                                         James C. Yoon, State Bar No. 177155
                                                          (jyoon@wsgr.com)
6                                                         Catherine R. Lacey, State Bar No. 291591
                                                          (clacey@wsgr.com)
7                                                         Jamie Y. Otto, State Bar No. 295099
                                                          (jotto@wsgr.com)
8                                                         WILSON SONSINI GOODRICH & ROSATI,
                                                          P.C.
9                                                         650 Page Mill Rd
                                                          Palo Alto, CA 94304-1050
10                                                        Tel:  650-493-9300
                                                          Fax: 650-565-5100
11
                                                          Lucy Yen, State Bar No. 224559
12                                                        (lyen@wsgr.com)
                                                          Cassie Black (*pro hac vice* forthcoming)
13                                                        (cblack@wsgr.com)
                                                          WILSON SONSINI GOODRICH & ROSATI,
14                                                        P.C.
                                                          1301 Avenue of the Americas
15                                                        40th Floor
                                                          New York, NY 10019
16                                                        Tel:  212-999-5800
                                                          Fax:  866-974-7329
17
                                                          *Attorneys for Defendant Visa Inc.*
18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing documents were served on all counsel of record via CM/ECF electronic mail on December 7, 2023.

Dated:  December 7, 2023

By: /s/ *Lucy Yen*
Lucy Yen, State Bar No. 224559
lyen@wsgr.com
WILSON SONSINI GOODRICH & ROSATI